UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
GAIL MCDONNELL,

                                    Plaintiff,

                                                                    10 CV 8140 (RPP)
                - against -

                                                                    **OPINION & ORDER**

FIRST UNUM LIFE INSURANCE CO.,
et al.

                                    Defendants.
----------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

On October 27, 2010, Plaintiff Gail McDonnell ("McDonnell") filed this action, arising

under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.A. § 1001,

against Defendants Morgan Stanley & Company Incorporated Disability Plan[1] and First Unum

Life Insurance Company ("First Unum").  (Compl. ¶ 1.)  Plaintiff argues that Defendant First

Unum improperly denied her application for long-term disability benefits; Plaintiff seeks to

"recover benefits due under an employee benefit plan, to clarify the rights of plaintiff to future

benefits under such plan, and to recover attorney fees and costs." (Id.)

On April 2, 2012, McDonnell and First Unum filed cross-motions for summary

judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure.  On June 16, 2012, both

parties timely filed their opposition papers.  On July 6, 2012, both parties timely filed their reply

papers.  Oral argument was held on August 16, 2012.  For the reasons stated below, the parties'

cross-motions for summary judgment are denied.

---

[1] On January 20, 2011, the parties filed a joint voluntary stipulation of dismissal, pursuant to Rule 41(a)(1)(A)(ii) of
the Federal Rules of Civil Procedure, dismissing Defendant Morgan Stanley & Company Incorporated Disability
Plan from the case without prejudice.

I.     **Facts**

From 1993 through 2007, McDonnell was employed as a Managing Director of Morgan Stanley & Company Incorporated ("Morgan Stanley").  (See Pl.'s Statement Pursuant to Local Rule 56.1 ("Pl.'s 56.1 Stmnt") ¶¶ 1, 5; First Unum's Local Civil Rule 56.1(b) Statement ("Def.'s 56.1 Resp.") ¶¶ 1, 5; Administrative Record[2] ("R.") 2, 62, 146-85, 1409.)  McDonnell describes her job as "managing a global group of over 40 people in New York and London, which required frequent travel to London, frequent meetings with senior management regarding the performance of the group; and extensive travel to visit clients and to present Morgan [Stanley's] capabilities for asset-based financing solutions."  (Pl.'s 56.1 Stmnt ¶ 6; R.899, 1409.)

As an employment benefit, Morgan Stanley provided McDonnell with long term disability insurance coverage under a group policy ("the Plan") issued by First Unum.  (See Pl.'s 56.1 Stmnt ¶¶ 2, 3; Def.'s 56.1 Resp. ¶¶ 2, 3; R.146-85.)  Under the heading "Mental Illness Limitation" ("MIL"), the Plan contains a provision that "[d]isabilities,[3] due to a sickness or injury, which are primarily due to a mental illness[4] have a limited pay period up to 24 months." (Pl.'s 56.1 Stmnt ¶ 201; Def.'s 56.1 Resp. ¶ 201; R.171.)  The Plan grants First Unum full discretionary authority "to determine an employee's eligibility for benefits and to construe the terms of this policy."  (Pl.'s 56.1 Stmnt ¶ 8; Def.'s 56.1 Resp. ¶ 8; R 155.)

Since the mid-1990s, McDonnell has experienced back pain; joint pain in the knees and hips; severe headaches; difficulty walking; and fatigue.  (See Pl.'s 56.1 Stmnt ¶ 15; Def.'s 56.1

---

[2] The Administrative Record has been Bates numbered with the prefix "FU-CL-LTD." The Court will cite pages in the Administrative Record as "R.___."

[3] The Plan states that "'[d]isability' and 'disabled' mean that because of injury or sickness . . . the insured cannot perform each of the material duties of his regular occupation." (R.162.)

[4] The Plan defines "mental illness" as "a psychiatric or psychological condition regardless of cause . . . . These conditions are usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment." (R.172.)

Resp. ¶ 15; R.305-15, 416-17, 1475.)  She consulted with many doctors due to these symptoms. (See Pl.'s 56.1 Stmnt ¶ 15; Def.'s 56.1 Resp. ¶ 15; R.305-15, 416-17, 1475.)  In 2006, McDonnell complained to one or more of her doctors that she was experiencing a progressive decline in her physical stamina and cognitive functioning.  (See Pl.'s 56.1 Stmnt ¶ 16; Def.'s 56.1 Resp. ¶ 16; R.386.)

McDonnell informed one or more of her doctors that on or about January 29, 2007, while on a business trip to Las Vegas, she was hospitalized for two days due to sharp chest pains, heavy chest pressure, difficulty breathing, and extreme fatigue.  (See Pl.'s 56.1 Stmnt ¶ 17; Def.'s 56.1 Resp. ¶ 17; R.386, 417, 586-622.)  On January 31, 2007, McDonnell stopped working for Morgan Stanley.  (See Pl.'s 56.1 Stmnt ¶ 18; Def.'s 56.1 Resp. ¶ 18; R.141, 215.)  On February 6, 2007, McDonnell was hospitalized again due to continuing symptoms plus an inability to stand, which was accompanied by dizziness and confusion.  (See Pl.'s 56.1 Stmnt ¶ 19; Def.'s 56.1 Resp. ¶ 19; R.386, 417.)

**A.  McDonnell's Benefits Claim Submission**

On or about July 2008, McDonnell submitted an application for long-term disability ("LTD") benefits to First Unum.[5]  (See Pl.'s 56.1 Stmnt ¶ 145; Def.'s 56.1 Resp. ¶ 145; R.133.)  By letter dated August 18, 2008, First Unum notified McDonnell's counsel that her claim had been filed late, that the reasons she provided did not excuse the late filing, and that First Unum was therefore closing her claim.  (First Unum's Rule 56.1 Statement ("Def.'s 56.1 Stmnt") ¶ 13; Pl.'s Response to Def.'s Rule 56.1 Statement ("Pl.'s 56.1 Resp.") ¶ 13; R.214-27.)  Nevertheless,

---

[5] First Unum initially learned received notice of McDonnell's claim on June 30, 2008, when it received a call from Morgan Stanley "'regarding a potential LTD claim . . . [about] an employee who has not worked for 1.5(+/-) years . . . [and] who thought she would get well enough to return to work and not need disability."  (Def.'s 56.1 Stmnt ¶ 9; Pl.'s 56.1 Resp. ¶ 9; R.88.)  First Unum advised Morgan Stanley that, because the employee in question had not worked for over a year, any claim would likely be untimely under the terms of the Plan; nevertheless, First Unum asked "'for the claim to be submitted to Unum'" so that it could "'investigate the situation and determine if contractually she would be eligible.'"  (Def.'s 56.1 Stmnt ¶ 10; Pl.'s 56.1 Resp. ¶ 10; R.89.)

by letter dated January 6, 2009, First Unum notified McDonnell's counsel that while the claim remained closed, "'we will be reviewing her medical records, once requested and received, to make a decision on her claim for benefits.'"  (Def.'s 56.1 Stmnt ¶ 14; Pl.'s 56.1 Resp. ¶ 14; R.270-71.)   First Unum then asked McDonnell to provide a list of the treatment providers she had seen since January 2007, along with the dates of service.  (See Def.'s 56.1 Stmnt ¶ 15; Pl.'s 56.1 Resp. ¶ 15; R.270.)

On February 5, 2009, Leo Shea, Ph.D. ("Dr. Shea"), a neuropsychologist, completed a Neuropsychological Evaluation Report, which assessed McDonnell's cognitive function and her ability to meet the demands of her position at Morgan Stanley based on his July 8, 2008, July 28, 2008, and September 22, 2008 examinations of McDonnell.  (See Pl.'s 56.1 Stmnt ¶ 149; Def.'s 56.1 Resp. ¶ 149; R.385-401.)   Dr. Shea noted that while McDonnell's "'clinical picture might be seen as one representing a Conversion Disorder or Somatization Disorder, her diagnosed Lyme disease represents a true organic disorder that has contributed to her multiple functional, emotional, and cognitive reductions.'" (Def.'s 56.1 Stmnt ¶ 42; Pl.'s 56.1 Resp. ¶ 42; R.396-97.) Dr. Shea concluded that McDonnell "'does not have the mental stamina or consistent cognitive ability'" to meet the demands of her job at Morgan Stanley or "'any work she might attempt'" for the foreseeable future.  (Pl.'s 56.1 Stmnt ¶¶ 150-52; Def.'s 56.1 Resp. ¶¶ 150-52; R.397-98.)

In support of her application for LTD benefits, McDonnell submitted to First Unum, by letter dated February 19, 2009, Dr. Shea's neuropsychological evaluation, medical records and reports from her treating doctors and medical professionals, and a response to the Claimant's Supplemental Statement form provided by First Unum.  (See Pl.'s 56.1 Stmnt ¶ 148; Def.'s 56.1 Resp. ¶ 148; R.283-759.)   McDonnell also submitted an eleven-page list of 133 medical

providers;[6] however, the list did not contain treatment dates.[7]  (See Def.'s 56.1 Stmnt ¶ 15; Pl.'s 56.1 Resp. ¶ 15; R.270, 865-66.)  On April 28, 2009, McDonnell provided a consolidated list of her nine "main doctors" that included treatment dates.  (See Def.'s 56.1 Stmnt ¶ 27; Pl.'s 56.1 Resp. ¶ 27; R.865-66.)

In May 2009, McDonnell submitted a statement prepared by her attending physician, Dr. Alan Pollock ("Dr. Pollock"), who diagnosed her as suffering from Lyme Disease.  (See Def.'s 56.1 Stmnt ¶ 16; Pl.'s 56.1 Resp. ¶ 16; R.1109-10.)  Although Dr. Pollock stated that McDonnell had "no significant physical restrictions," he also stated that she should sit, stand, and walk for no more than one hour each during a workday and concluded that she was unable to engage in "intellectual work, processing new material, recent memory, judgment[, or] verbal expression." (See Def.'s 56.1 Stmnt ¶ 16; Pl.'s 56.1 Resp. ¶ 16; R.1109-10.)

## B.  First Unum's Evaluation of McDonnell's Claim

### i.  Dr. Leverett's OSP Review and Follow-Up

In August 2009, First Unum asked Dr. Steven Leverett ("Dr. Leverett"), who is board-certified in family medicine and one of First Unum's in-house medical consultants, to complete an on-site physician ("OSP") written review of McDonnell's claim.  (See Pl.'s 56.1 Stmnt ¶ 155; Def.'s 56.1 Resp. ¶ 155; Def.'s 56.1 Stmnt ¶ 29; Pl.'s 56.1 Resp. ¶ 29; R.1374-75.)  Dr. Leverett's OSP report is dated September 10, 2009.[8]  (See Def.'s 56.1 Stmnt ¶ 29; Pl.'s 56.1

---

[6] The list included McDonnell's brother, an old college roommate, and a yoga instructor; upon being contacted by First Unum, some of the people listed denied ever having seen McDonnell.  (See Def.'s 56.1 Stmnt ¶¶ 21-24; Pl.'s 56.1 Resp. ¶¶ 21-24; R.308, 824, 837, 840-55.)

[7] It is unclear from the Administrative Record on what date this list was submitted.  (See Def.'s 56.1 Stmnt ¶ 17; Pl.'s 56.1 Resp. ¶¶ 15, 17; R.783-84.)  McDonnell contends that she was not informed that the list did not include treatment dates until March 19, 2009, and that had First Unum informed her sooner, she would have provided the consolidated list of medical providers sooner.  (Pl.'s 56.1 Resp. ¶¶ 17, 26; R.803.)

[8] Dr. Leverett did not physically examine McDonnell as part of his review; he only reviewed the medical records in her claim file.  (Pl.'s 56.1 Stmnt ¶ 169; Def.'s 56.1 Resp. ¶ 169.)

Resp. ¶ 29; R.1374-88.)  After summarizing the medical evidence,[9] Dr. Leverett stated that

although McDonnell reported symptoms consistent with Lyme disease, "'there is no

documentation of physical exam findings that would be consistent with Lyme disease . . . .'"

(Def.'s 56.1 Stmnt ¶¶ 33, 35; Pl.'s 56.1 Resp. ¶¶ 33, 35; Pl.'s 56.1 Stmnt ¶ 156; Def.'s 56.1

Resp. ¶ 156; R.1386, 1388.)  Moreover, Dr. Leverett asserted that the Lyme disease blood tests

administered to McDonnell "did not meet the [Center for Disease Control ("CDC")] threshold

criteria[10] for a definitive diagnosis of Lyme disease,'" and thus he characterized the positive

results of those Lyme disease blood tests as false positives.  (Def.'s 56.1 Stmnt ¶¶ 35-36; Pl.'s

56.1 Resp. ¶¶ 35-36; Pl.'s 56.1 Stmnt ¶ 156; Def.'s 56.1 Resp. ¶ 156; R.1386, 1388.)

Dr. Leverett further noted that McDonnell had previously received courses of antibiotics

that he contended "'would be more than adequate treatment for Lyme disease."  (Def.'s 56.1

Stmnt ¶ 39; Pl.'s 56.1 Resp. ¶ 39; R.1386.)  Accordingly, although Dr. Leverett acknowledged

that the physical symptoms McDonnell reported were consistent with Lyme disease, he

concluded that a Lyme disease diagnosis was nevertheless unsupported by the medical evidence;

thus, he concluded that McDonnell's symptoms were "more consistent with" a psychiatric cause,

specifically Somatoform Disorder.[11]  (See Pl.'s 56.1 Stmnt ¶¶ 160-62; Def.'s 56.1 Resp. ¶¶ 160-

62; Def.'s 56.1 Stmnt ¶¶ 40, 44-45; Pl.'s 56.1 Resp. ¶¶ 40, 44-45; R.1386-88.)

---

[9] Dr. Leverett noted that the records for several of McDonnell's treating medical professionals were largely illegible or generally illegible, though he did refer to some parts of those records in his review.  (See Pl.'s 56.1 Stmnt ¶167; Def.'s 56.1 Resp. ¶ 167; R.1380-82.)  First Unum did not obtain transcripts of those records or inform McDonnell of Dr. Leverett's inability to read them.  (See Pl.'s 56.1 Stmnt ¶167; R.1380-82.)  In such a situation, the burden is on the insurer to inform the claimant of the problem and provide her with an opportunity to address it.  See Palmotti v. Met. Life Ins. Co., 423 F. Supp. 2d 288, 300-03 (S.D.N.Y. 2006).

[10] Dr. Leverett cited the CDC Morbidity and Mortality Weekly Report, dated February 11, 2005, but did not cite to the CDC Clinical Diagnostic Criteria or the CDC 2008 Case Definition for Lyme disease.  (See Pl.'s 56.1 Stmnt ¶157; Def.'s 56.1 Resp. ¶ 157; R.1380.)

[11] Dr. Leverett also explained that due to what he interpreted as insufficient laboratory evidence to support the diagnosis, he found Dr. Shea's acceptance of the conclusion by some of McDonnell's physicians that Lyme disease

On September 10, 2009, Dr. Leverett wrote to Dr. Pollock, who had submitted the Attending Physician's Statement diagnosing McDonnell with Lyme disease.  (See Def.'s 56.1 Stmnt ¶¶ 16, 46; Pl.'s 56.1 Resp. ¶¶ 16, 46, 44-45; R.1109-10, 1394-95.)  After explaining why he believed that "McDonnell's clinical presentation is more consistent with a Somatoform Disorder, rather than sequelae of her chronic Lyme disease," Dr. Leverett asked Dr. Pollock two questions: "Do you agree with my analysis . . . ?  If no, what is the clinical rationale that supports your opinion?"  (Def.'s 56.1 Stmnt ¶ 46; Pl.'s 56.1 Resp. ¶ 46, 44-45; R.1394-95.)

Dr. Pollock did not respond by November 3, 2009, at which point Dr. Leverett recommended that a designated medical officer ("DMO") review the file to resolve the disagreement on McDonnell's diagnosis.  (See Pl.'s 56.1 Stmnt ¶ 186; Def.'s 56.1 Resp. ¶ 186; Def.'s 56.1 Stmnt ¶ 47; Pl.'s 56.1 Resp. ¶ 47; R.1472.)  Dr. Gary P. Greenhood ("Dr. Greenhood"), an internal medicine and infectious diseases specialist, completed the DMO review on November 9, 2009, and concluded that he concurred with Dr. Leverett.[12]  (See Pl.'s 56.1 Stmnt ¶ 188; Def.'s 56.1 Resp. ¶ 188; R.1479.)  Dr. Greenhood stated that McDonnell's blood testing did not support a diagnosis of Lyme disease and that "'[n]o other cause of a physically based illness . . . is supported.'"  (Def.'s 56.1 Stmnt ¶¶ 61, 65; Pl.'s 56.1 Resp. ¶¶ 61, 65; R.1479.)

### ii.  Dr. Black's OSP Review and Follow-Up

In September 2009, First Unum requested a second OSP written review of McDonnell's claim file.  (See Pl.'s 56.1 Stmnt ¶ 170; Def.'s 56.1 Resp. ¶ 170; R.1398-1400.)  In his OSP

---

represented the root cause of her symptoms "dubious."  (Def.'s 56.1 Stmnt ¶¶ 41-44; Pl.'s 56.1 Resp. ¶¶ 41-44; R.385-98, 1387-88.)

[12] Dr. Greenhood did not physically examine or test McDonnell as part of his review.  (Pl.'s 56.1 Stmnt ¶ 198; Def.'s 56.1 Resp. ¶¶ 198.)

review,[13] dated September 23, 2009, F. William Black, Ph.D. ("Dr. Black"),[14] a

neuropsychologist and in-house medical consultant for First Unum, also concluded that

McDonnell's diagnosis of Lyme disease "'is not supported by the medical evidence.'"[15]  (Pl.'s

56.1 Stmnt ¶ 173; Def.'s 56.1 Resp. ¶ 173; R.1403-04.)  Accordingly, Dr. Black dismissed Dr.

Shea's neuropsychological findings, which were based on a Lyme disease diagnosis, and instead

concluded that that McDonnell's cognitive problems – which he acknowledged were supported

by her test data – were the result of a "primary behavioral condition," not "an organic etiology."

(Pl.'s 56.1 Stmnt ¶¶ 173-75; Def.'s 56.1 Resp. ¶¶ 173-75; Def.'s 56.1 Stmnt ¶¶ 49-50; Pl.'s 56.1

Resp. ¶¶ 49-50; R.1403-04.)

On October 5, 2009, Dr. Black requested clarification from Dr. Shea concerning "'what

clinical indications or medical information you have seen that would support a diagnosis of

chronic Lyme disease, resulting in cognitive dysfunction.'"  (Pl.'s 56.1 Stmnt ¶ 178; Def.'s 56.1

Resp. ¶ 178; R.1425-26.)   Dr. Shea responded by stating that whether or not McDonnell suffers

from Lyme disease "'is a determination made by an M.D. not a Ph.D. – it is in my report because

that is the medical DX she was given[.]'"  (Pl.'s 56.1 Stmnt ¶ 179; Def.'s 56.1 Resp. ¶ 179;

R.1431-32.)  Dr. Black did not follow up by contacting any of the other physicians who

diagnosed McDonnell with Lyme disease.  (See Pl.'s 56.1 Stmnt ¶ 180; Def.'s 56.1 Resp. ¶ 180.)

On October 13, 2009, Dr. Black stated that "'[a]s a difference of opinion [exists] . . . between the

---

[13] Dr. Black did not physically examine McDonnell as part of his review.  (Pl.'s 56.1 Stmnt ¶ 177; Def.'s 56.1 Resp. ¶ 177.)

[14] Although the file was initially sent to Dr. Van de Mark, it was subsequently redirected to Dr. Black.  (See Pl.'s 56.1 Stmnt ¶¶ 171-72; Def.'s 56.1 Resp. ¶¶ 171-72; R.1400.)  The Administrative Record does not contain Dr. Van de Mark's first name.  (R1400.)

[15] Indeed, referring to Dr. Shea's Neuropsychological Evaluation Report, Dr. Black determined that "[t]he primary, if not total source of medical information appearing in the NP [neuropsychologist's] written report appears to be self-report by the claimant." (Def.'s 56.1 Stmnt ¶ 50; Pl.'s 56.1 Stmnt ¶ 50; R.1404.)

conclusions[] of Dr. Shea and [Dr. Black], a DMO Review is necessary[]y to resolve this difference.'"  (Pl.'s 56.1 Stmnt ¶ 181; Def.'s 56.1 Resp. ¶ 181; R.1435.)

On October 13, 2009, First Unum asked psychologist D. Malcolm Spica, Ph.D. ("Dr. Spica"), an in-house medical consultant, to complete a DMO written review of McDonnell's case file.[16]  (See Pl.'s 56.1 Stmnt ¶ 182; Def.'s 56.1 Resp. ¶ 182; R.1437-39.)  In his DMO review, dated October 16, 2009, Dr. Spica concluded that he concurred with Dr. Black's opinion. (See Def.'s 56.1 Stmnt ¶ 59; Pl.'s 56.1 Stmnt ¶ 59; R.1442-43.)  Dr. Spica disagreed with Dr. Black and found that McDonnell was not cognitively impaired, and that "[t]he mild variability in the claimant's performance is most reasonably attributed to her detected behavioral health issues," not a physical cause.  (Pl.'s 56.1 Stmnt ¶ 183; Def.'s 56.1 Resp. ¶ 183; R.1441-43.)

### C.  First Unum's Benefits Decision

By letter dated November 11, 2009, Elizabeth Cleale ("Cleale"), a Senior Disability Benefits Specialist for First Unum, informed counsel for McDonnell that First Unum had approved benefits of $459,600, which covered only the twenty-four month period of July 31, 2007 through July 30, 2009.  (See Pl.'s 56.1 Stmnt ¶ 199; Def.'s 56.1 Resp. ¶ 199; Def.'s 56.1 Stmnt ¶¶ 66-67; Pl.'s 56.1 Resp. ¶¶ 66-67; R.1482-89.)  This was the maximum benefit allowable under the Plan's MIL for a disability resulting from a mental illness.  (See Def.'s 56.1 Stmnt ¶ 66; Pl.'s 56.1 Resp. ¶ 66; R.1482-89.)  In explaining the decision to apply the MIL to McDonnell's claim, Cleale's November 11, 2009 letter summarized the medical evidence that

---

[16] Dr. Spica did not physically examine or test McDonnell.  (Pl.'s 56.1 Stmnt ¶ 185; Def.'s 56.1 Resp. ¶ 185; R.1439-43.)

First Unum had gathered and the evaluations of its reviewing doctors.[17]   (See Def.'s 56.1 Stmnt ¶ 68; Pl.'s 56.1 Resp. ¶ 68; R.1482-89.)

### D.  McDonnell's Administrative Appeal

By letter dated August 6, 2010, McDonnell timely appealed First Unum's "wrongful discontinuation of her benefits under the MIL," and submitted additional medical evidence in support of her claim.  (See Pl.'s 56.1 Stmnt ¶¶ 216-17; Def.'s 56.1 Resp. ¶¶ 216-17; R.1551-1727.)  This additional medical evidence included a functional capacity evaluation (FCE) report by Ellen Rader Smith ("Rader Smith"); a neuropsychological reevaluation conducted by Dr. Shea; and updated medical records, "including the residual functional capacity questionnaires from five of McDonnell's treating doctors and medical professionals," each of whom opined that she was disabled from any occupation.  (Pl.'s 56.1 Stmnt ¶ 217; Def.'s 56.1 Resp. ¶ 217; R.1558-1727.)

#### i.  *Rader Smith's FCE Report*

On April 14, 2010, Rader Smith performed a FCE of McDonnell.  (See Pl.'s 56.1 Stmnt ¶ 218; Def.'s 56.1 Resp. ¶ 218; R.1573-86.)  In her report, dated May 4, 2010, Rader Smith concluded that "McDonnell . . . cannot resume work in a corporate environment as she cannot remain in one seated, standing or alternate posture without the onset of distracting pain that

---

[17] By letter dated November 16, 2009, counsel for McDonnell demanded that First Unum provide, inter alia, "[a] description whether an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination" and sought guidance as to "[t]he specific type of evidence . . . McDonnell should provide to UNUM to adequately support that she has systemic or CNS Lyme disease."  (Pl.'s 56.1 Stmnt ¶ 214; Def.'s 56.1 Resp. ¶214; R.1500.)  By letter dated December 29, 2009, First Unum responded by stating that "First Unum believes that the correspondence dated November 11, 2009, has adequately outlined the medical information that was gathered during the administration of Ms. McDonnell's claim."  (Pl.'s 56.1 Stmnt ¶ 215; Def.'s 56.1 Resp. ¶215; R.1500.)  First Unum further stated that "any additional information which your client chooses to submit that supports her position that the symptoms of Lyme Disease restrict her ability to perform the physical demands of her occupation would be given due consideration by First Unum."  (Def.'s 56.1 Resp. ¶ 215; R.1514.)

limits her physical and intellectual thinking abilities, concentration, memory, and ability to remain task focused."  (Pl.'s 56.1 Stmnt ¶ 219; Def.'s 56.1 Resp. ¶ 219; R.1583.)

### ii.   Dr. Shea's Reevaluation

On July 30, 2010, Dr. Shea completed a Neuropsychological Re-Evaluation Report based on his May 25, 2010, June 1, 2010, and June 5, 2010 evaluations of McDonnell.  (See Pl.'s 56.1 Stmnt ¶ 221; Def.'s 56.1 Resp. ¶ 221; R.1558-70.)  In his report, Dr. Shea ruled out the possibility that McDonnell suffered from Cognitive Disorder, Conversion Disorder, Somatization Disorder, or Undifferentiated Somatoform Disorder "'given the multiple confirmations of her medical diagnosis for [tick]-borne illnesses.'"  (Pl.'s 56.1 Stmnt ¶¶ 223-24; Def.'s 56.1 Resp. ¶¶ 223-24; R.1560-61, 1566.)   Dr. Shea also observed that his re-evaluation of McDonnell revealed a decline in cognitive and adaptive functioning since he first examined her in 2008.  (See Pl.'s 56.1 Stmnt ¶¶ 225-26; Def.'s 56.1 Resp. ¶¶ 225-26; R.1560-67.)   Dr. Shea's report concludes that "because of the deficits exhibited on this evaluation, [McDonnell] is incapable of holding a full-time (or even part-time) position of a competitive and complex nature.  For all practical purposes, given her diagnosed medical condition, its sequelae and her performance on present testing she is fully disabled."  (Pl.'s 56.1 Stmnt ¶ 222; Def.'s 56.1 Resp. ¶ 222; R.1567.)

### iii.   Questionnaires from Treating Doctors and Medical Professionals

Five of McDonnell's treating doctors and medical professionals filled out residual functional capacity questionnaires in which they indicated that McDonnell was disabled from performing her job at Morgan Stanley or any other occupation.[18]  (See Pl.'s 56.1 Stmnt ¶¶ 229-243; Def.'s 56.1 Resp. ¶¶ 229-243; R.1587-92, 1608-13, 1617-28, 1633-38.)[19]

---

[18] The five treating doctors and medical professionals were Dr. Steven Phillips, who has been McDonnell's treating physician since April 2008; Anna Kelly, Lac, McDonnell's treating acupuncturist since January 2008; Dr. Jerry

### E.  First Unum's Review of McDonnell's Appeal

As part of its evaluation of McDonnell's administrative appeal, First Unum ordered two additional medical reviews of McDonnell's claim file.  (See Pl.'s 56.1 Stmnt ¶¶ 248, 266-68; Def.'s 56.1 Resp. ¶¶ 248, 266-68; R.1769-70, 1775-80.)  In his OSP written review, dated September 14, 2010, Dr. Costas Lambrew ("Dr. Lambrew") concluded that McDonnell's "'diagnosis of Lyme disease has not been established,'" (Pl.'s 56.1 Stmnt ¶ 249; Def.'s 56.1 Resp. ¶ 249; R.1772), "by CDC criteria as accepted by the New York state [sic] Department of Health, nor have there been clinical manifestations, or complications of Lyme disease," (R.1772.)[20]  Dr. Lambrew also ruled out McDonnell's alternative diagnoses of Babesiosis and Chronic Fatigue Syndrome ("CFS"), noting that although McDonnell "'meets some of the criteria'" for CFS, her testing did not support such a diagnosis.  (Pl.'s 56.1 Stmnt ¶¶ 255, 257-58; Def.'s 56.1 Resp. ¶¶ 255, 257-58; R.1771-72.)  Dr. Lambrew deferred "'evaluation of cognitive function . . . to a Neuropsychologist.'"  (Pl.'s 56.1 Stmnt ¶ 262; Def.'s 56.1 Resp. ¶ 262; R.1770.)

On September 22, 2010, Daniel Benincasa, Psy.D. ("Dr. Benincasa"), who is board-certified in Forensic Psychology-Neuropsychology, completed a written review of McDonnell's claim file[21] in which he concluded that he agreed with the opinions of First Unum's OSP psychologists Dr. Black and Dr. Spica that McDonnell's "primary condition is behavioral and

---

Gliklich, McDonnell's treating cardiologist since March 2007; Carol Goldstein, McDonnell's treating chiropractor since 1999; and Dr. Patrick Fratellone, McDonnell's treating internist/cardiologist since August 2007.  (See

[19] First Unum asserts that these doctors and medical professionals failed to provide medical support or explanation for their opinions.  (See Def.'s 56.1 Resp. ¶¶ 229-32, 235-43.)

[20] Dr. Lambrew did not physically examine or test McDonnell.  (Pl.'s 56.1 Stmnt ¶ 265; Def.'s 56.1 Resp. ¶ 265; R.1770-73.)

[21] Although Dr. Benincasa received the raw data associated with Dr. Shea's June 5, 2010 evaluation of McDonnell, he did not review the report connected with this data.  (See Pl.'s 56.1 Stmnt ¶ 273; Def.'s 56.1 Resp. ¶ 273; R.1777.)

psychiatric in the form of Conversion and Somatoform Disorders."[22]  (Pl.'s 56.1 Stmnt ¶¶ 268, 270; Def.'s 56.1 Resp. ¶¶ 268, 270; Def.'s 56.1 Stmnt ¶ 89; Pl.'s 56.1 Resp. ¶ 89; R.1775-80.) Dr. Benincasa further stated that Dr. Shea, McDonnell's neuropsychologist, "'mistakenly believes that the claimant has Lyme disease . . . [but] he does not have the benefit of all the medical data on hand and the professional medical reviews completed.'"  (Def.'s 56.1 Stmnt ¶ 90; Pl.'s 56.1 Resp. ¶ 90; R.1779.)

By letter dated October 1, 2010, Denise Laverriere ("Laverriere"), First Unum's Lead Appeals Specialist, informed McDonnell of First Unum's determination to uphold its determination on administrative appeal and thus apply the MIL to McDonnell's benefits claim. (Pl.'s 56.1 Stmnt ¶ 281; Def.'s 56.1 Resp. ¶ 281; R.1785-92.)  In reaching this determination, First Unum relied on the OSP written review by Dr. Lambrew, the written review by Dr. Benincasa, and the other evidence in the administrative record.  (Pl.'s 56.1 Stmnt ¶ 282; Def.'s 56.1 Resp. ¶ 282; R.1785-92.)  Laverriere testified that when the medical review on appeal is the same as the DMO review at the claims level, "that essentially ends the inquiry."  (Def.'s 56.1 Resp. ¶ 294; see also Pl.'s 56.1 Stmnt ¶ 294.)

## II.   **Appropriate Standard of Review**

This action concerning the denial of disability benefits is governed by ERISA, 29 U.S.C.A. § 1001, but "ERISA does not set out the applicable standard of review for actions challenging benefit eligibility determinations."  Fay v. Oxford Health Plan, 287 F.3d 96, 103 (2d Cir. 2002) (internal quotations and citations omitted).  The Supreme Court has held that an insurer's "denial of benefits challenged under [ERISA] is to be reviewed under a de novo standard unless" the benefit plan provides the plan's administrator or fiduciary with

---

[22] Dr. Benincasa did not physically examine or test McDonnell.  (Pl.'s 56.1 Stmnt ¶ 280; Def.'s 56.1 Resp. ¶ 280; R.1775-80.)

"discretionary authority to determine eligibility for benefits or to construe the terms of the plan" (hereinafter, "discretionary authority").  Id. at 104 (quoting Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)).

In situations where the benefits plan gives the plan administrator or fiduciary such discretionary authority, courts "will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious."  Pagan v. NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995). In contrast, if Plaintiff's benefits determination was made by an unauthorized party who lacked such discretionary authority or improperly exercised it, the Court will review the unauthorized party's benefits determination under a de novo standard of review.  Sharkey v. Ultramar Energy Ltd., Lasmo plc, Lasmo (AUL Ltd.), 70 F.3d 226, 229 (2d Cir. 1995).

The plan administrator bears the burden of proving that the deferential standard of review applies.  Id. (citing Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 249 (2d Cir. 1999)).  Although express use of the terms "deference" and "discretion" in the plan is not necessary to avoid a de novo standard of review, courts construe ambiguities in the plan's language against the insurer.  Id. (citing Kinstler, 181 F.3d at 251–52).

Here, both parties agree that the benefit plan issued by First Unum to Morgan Stanley explicitly granted discretionary authority only to First Unum.  (Pl.'s 56.1 Stmnt ¶ 8; Def.'s 56.1 Stmnt ¶ 2).  The parties also agree that Cleale and Laverriere, the individuals who made and upheld the decision to apply the MIL to McDonnell's long-term benefits claim, were employees of Unum Group,[23] not First Unum.  (Pl.'s 56.1 Stmnt ¶ 12; Def.'s 56.1 Resp. ¶ 12.)  The parties disagree, however, about whether or not Cleale and Laverriere (the "Unum Group employees") properly exercised discretionary authority under the Plan to make this benefits determination,

---

[23] Unum Group is the "owner" of First Unum and a holding company of all Unum Group subsidiaries.  (Decl. of Susan Roth in Opp'n to Pl's Summ. J. Mot.  ("Roth Decl.") ¶ 1, 2).

and therefore the parties disagree about which standard of review – de novo or arbitrary and capricious – the Court should apply here.

McDonnell argues that the Unum Group employees were not granted discretionary authority of their own under the Plan, and that First Unum did not properly delegate its discretionary authority to the Unum Group employees either.  (Pl.'s 56.1 Stmnt ¶¶ 9-12; Pl.'s Mem. of Law in Supp. of Summ. J. ("Pl.'s Mem.") at 3).  Accordingly, McDonnell asserts that the Court should review the Unum Group employees' benefits decision de novo.  (Pl.'s Mem. at 3); see Muller v. First Unum Life Ins., 341 F.3d 119, 123-24 (2d Cir. 2003) (quoting Firestone, 489 U.S. at 115 (holding that where the person who made benefits decisions does not have discretionary authority, the court applies a de novo review).

First Unum, however, argues that the Unum Group employees were acting as agents of First Unum, and therefore no delegation of discretionary authority was necessary.  (Def.'s 56.1 Resp. ¶ 12; First Unum's Br. in Opp. of Pl.'s Summ. J. Mot. ("Def.'s Opp.") at 11.)  By First Unum's logic, the Unum Group employees stood in the place of First Unum and therefore properly exercised First Unum's discretionary authority to make benefits decisions.  (Def.'s Resp. Pl.'s 56.1 Stmnt ¶ 12; Def.'s Opp. at 11.)  In the alternative, First Unum argues that even if the Court were to find that the Unum Group employees did not act as First Unum's agents, First Unum nevertheless properly delegated its discretionary authority to Unum Group.  (See Def.'s Opp. at 5.)  Accordingly, First Unum argues that the Court should review the denial of benefits to the McDonnell under the arbitrary and capricious standard of review.  See Pagan, 52 F.3d at 441 (ruling that the arbitrary and capricious standard of review is used where a fiduciary is acting within its discretionary authority).

For the reasons stated below, the Unum Group employees were not acting as First Unum's agents and First Unum did not properly delegate its discretionary authority to Unum Group.  Accordingly, the denial of benefits to McDonnell is reviewed under the de novo standard of review.

**A. The Unum Group Employees as Agents of First Unum**

In support of its argument that the Unum Group employees who made McDonnell's benefits denial were acting as agents of First Unum and thus properly within its discretionary authority, (Def.'s Opp. at 10), First Unum relies on two well-established principles of state contract law: (1) a corporation can only act through its agents, see Braswell v. United States, 487 U.S. 99, 110 (1988), and (2) a corporation's agents need not be employees of the corporation, see Sullivan v. LTV Aerospace and Defense Co., 82 F.3d 1251, 1255 (holding that outside directors of a corporation, who were not employees, were ERISA fiduciaries).  Accordingly, First Unum argues that it could only act through agents to render a decision on McDonnell's application for benefits, and that it engaged the Unum Group employees for this purpose.  (See Pl.'s 56.1 Stmnt ¶ 8; Def.'s 56.1 Stmnt ¶ 2).  Therefore, First Unum contends that because it had discretionary authority under the Plan, the Unum Group employees, functioning as First Unum's agents, properly acted under First Unum's discretionary authority when they made the decision to apply the MIL to McDonnell's benefits application.  (See Def.'s Opp. at 11-12.)

In support of this position, First Unum provides the declaration of Susan Roth ("Roth"), Vice President and Corporate Secretary of Unum Group.  (See Roth Decl., June 14, 2012, ECF No. 53.)  Roth points to the General Service Agreement ("GSA") between First Unum and Unum Group to support First Unum's position that Unum Group employees were acting under First

Unum's discretionary authority when they made the decision about McDonnell's benefits claim. The GSA states that:

> The performance of the Services by [Unum Group] for [First Unum] pursuant to this Agreement shall in no way impair the absolute control of the business and operations of [Unum Group] or [First Unum] . . .  The Services shall at all times be subject to the discretion and control of the Board of Directors of [First Unum].

(Roth Decl. ¶ 7; Roth Decl., Ex. 1 ("GSA") § 1.07)).  Roth asserts that this section of the GSA demonstrates that in their determinations of claims, the Unum Group employees acted subject to First Unum's "absolute control," (Roth Decl. ¶ 7), and thus the Unum Group employees were First Unum's agents, (Def.'s Opp. at 10).  Therefore, it was functionally First Unum who made the decision to apply the MIL to Plaintiff's claim for benefits.  (Id.)  First Unum contends that no delegation of discretionary authority to Unum Group was necessary and none occurred.  (Def.'s Opp. at 12).  Consequently, First Unum argues that the Court should apply the arbitrary and capricious standard of review.  (Id.)

First Unum's argument depends on the twin premises that (1) a corporation with discretionary authority under a benefits plan may allow any person or entity it designates as its agent to make benefits decisions on its behalf, and (2) that the agent's determination warrants the deference of an arbitrary and capricious standard of review.  (See Tr. of Aug. 16, 2012 Oral Arg. ("Tr.") at 12.)  Indeed, McDonnell argues that

> If UNUM is correct that it could, without satisfying ERISA, merely contract with an "agent" to assume fiduciary duties in its stead, then UNUM could also delegate those duties to the lowest bidder (and the lowest bidder to an even lower bidder) . . . without even obtaining the consent of the Plan Sponsor [here, Morgan Stanley].  Such a system improperly writes §§ 402(a)(2), 402(b)(3), 402(c)(2) and 405(c)(1)[24] out of ERISA.

---

[24] These are the sections of ERISA that codify how a plan administrator may delegate its discretionary authority.

(Pl.'s Reply Mem. of Law in Further Supp. of Summ. J. ("Pl.'s Reply") at 2-3; see also Tr. at 5.) This legal question concerning the discretionary authority of an insurer's agents would be an issue of first impression in the Second Circuit.[25]

The Court, however, need not reach this novel issue. First Unum and Unum Group had the freedom to contractually define their relationship, and they did so within the GSA.[26]   Indeed, Section 8 of the GSA states that: "The parties agree that [Unum Group] is engaged in an independent business and will perform its obligations under this Agreement as an independent contractor and not as the employee, partner or agent [of First Unum.]"  (GSA § 8) (emphasis added).  Therefore, First Unum's own documents demonstrate that the Unum Group employees were not agents acting within the discretionary authority of First Unum when they made the determination to apply the MIL to McDonnell's benefits application.  Instead, the GSA reveals that the Unum Group employees were independent contractors.  (See id.)  As such, the Unum Group employees did not operate under the discretionary authority granted to First Unum by the Plan.  Thus, the Unum Group employees' benefits determination was not the decision of a fiduciary acting within its own discretionary authority, and therefore it does not qualify for an arbitrary and capricious review under this theory.  See Pagan, 52 F.3d at 441.

---

[25]Circuit courts are currently split on the standard of review for non-fiduciary agents, not mentioned in plan documents, who make benefits decisions.  The majority of circuit courts that have addressed the issue have held that if an unauthorized party makes a benefits decision, that decision is reviewed de novo.  See e.g., Shane v. Albertson's Inc., 504 F.3d 1166, 1170-1171 (9th Cir. 2007); Sanford v. Harvard Indus., 262 F.3d 590, 596-597 (6th Cir. 2001); Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 583-584 (1st Cir. 1993); Baker v. Big Star Div. of the Grand Union Co., 893 F.2d 288, 290-292 (11th Cir 1989).  In contrast, the Tenth Circuit has taken the minority position that "nothing prevents [a named fiduciary] from . . . delegating portions of its authority to non-fiduciary third parties." Geddes v. United Staffing Alliance Employee Med. Plan, 469 F.3d 919, 921-2 (10th Cir. 2006).  The United States has criticized the Tenth Circuit's interpretation.  See Br. U.S. Amicus Curiae: Geddes v. United Staffing Alliance, 12-13.

[26] Since First Unum cited Section 7 of the GSA in the declaration it attached in support of its opposition brief, (see Def.'s Opp. at 11; Roth Decl. ¶ 7), and during oral argument referenced the provisions in the GSA dealing with the relationship between First Unum and Unum Group, (see Tr. at 13-14), it strains credulity that the Defendant was not aware of the content of Section 8, which appears on the same page of the GSA as Section 7, (see GSA §§ 7-8.) Given that Section 8 explicitly defines Unum Group employees as independent contractors and not agents of First Unum, (see id. § 8), Defendant's agency argument is meritless.

**B.  First Unum's Delegation of Discretionary Authority**

Because First Unum is the only party granted discretionary authority by the Plan, (see Pl.'s 56.1 Stmnt ¶ 8; Def.'s 56.1 Stmnt ¶ 2; R.147-85), and because the GSA dictates that the Unum Group employees were not acting as First Unum's agents, see discussion supra, the only way that Unum Group properly had discretionary authority here is if First Unum lawfully delegated its own authority to Unum Group, (see Pl.'s Mem. at 4); see also Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 584 (1st Cir. 1993) (holding that discretionary authority must be properly delegated for the arbitrary and capricious standard of review to apply); Madden v. ITT Long Term Disability Plan for Salaried Employees, 914 F.2d 1279, 1284-85 (9th Cir. 1990); Rubio v. Chock Full O'Nuts Corp., 254 F. Supp. 2d 413, 422 (S.D.N.Y. 2003).  As First Unum is the party claiming deferential review, it has the burden to show that it properly delegated its discretionary authority to Unum Group.  Sharkey, 70 F.3d at 230.

First Unum, relying upon the Tenth Circuit's decision in Geddes, argues that it held the inherent power to delegate its discretionary authority to a third party regardless of whether delegation procedures were expressly outlined in the Plan.  (Def.'s Mem. at 12 (citing Geddes, 469 F.3d at 926) ("Once a health plan administrator . . . has been delegated discretionary authority under the terms of the ERISA plan, nothing prevents that administrator from then delegating portions of its discretionary authority to non-fiduciary third parties . . . .").  According to Geddes, benefits decisions "made by an independent, non-fiduciary third party at the behest of the fiduciary plan administrator are entitled to" the deference inherent in arbitrary and capricious review.  469 F.3d at 921-2.

The Tenth Circuit's decision to the contrary in Geddes is distinguishable from the case at bar, however.  The Geddes court justified its decision by stating that a third-party receives an

arbitrary and capricious standard of review because "third parties <u>act only as agents of the</u> <u>fiduciary</u>." 469 F.3d at 927 (emphasis added). Here, however, the Unum Group employees were not acting as agents of First Unum because the GSA explicitly defines the Unum Group employees as independent contractors. (<u>See</u> GSA § 8 ("The parties agree that [Unum Group] is engaged in an independent business and will perform its obligations under this Agreement <u>as an</u> <u>independent contractor and not as the</u> employee, partner or <u>agent</u> [of First Unum)" (emphasis added).) Thus, the <u>Geddes</u> court's underlying logic is inapposite.

 In fact, however, ERISA explicitly states that an outside party not named in the Plan may only be vested with discretionary authority "pursuant to a procedure specified in the plan." <u>ERISA</u> § 402(a)(2), 29 U.S.C. § 1102(a)(2); (Pl.'s Mem. at 4). In sections 402(c)(2), 405(c)(1), and 402(b)(3), ERISA further describes how a benefits plan could contain procedures or create amendments to vest additional fiduciaries with discretionary authority. Interpreting these provisions of ERISA, the First Circuit in <u>Rodriguez-Abreu</u> held that:

> ERISA allows named fiduciaries to delegate responsibilities . . .
> through <u>express procedures provided in the plan</u>. 29 U.S.C.
> § 1105(c)(1). To be an effective delegation of discretionary
> authority so that the deferential standard of review will apply,
> therefore, the fiduciary must properly designate a delegate for the
> fiduciary's discretionary authority.

986 F.2d at 584 (emphasis added). The Ninth Circuit issued a parallel holding in <u>Madden</u>, 914 F.2d at 1283-84, and S.D.N.Y. Judge Marrero came to the same conclusion in <u>Rubio</u>, 254 F. Supp. 2d at 422.

 Consistent with Judge Marrero's holding in <u>Rubio</u>, but contrary to First Unum's argument, under ERISA the delegation power is not inherent; a named fiduciary can delegate the discretionary authority provided to it by a benefits plan only when the plan sets out the authority and procedures for doing so and those procedures are followed. <u>See</u> <u>ERISA</u> § 402(a)(2), 29

U.S.C. § 1102(a)(2); <u>Rodriguez-Abreu</u>, 986 F.2d at 584; <u>Madden</u>, 914 F.2d at 1284; <u>Rubio</u>, 254 F. Supp. 2d at 422); (<u>see also</u> Pl.'s Mem. at 6-7.)

Here, as discussed <u>supra</u> at 14, the parties agree that employees of Unum Group made McDonnell's benefits determination.  (<u>See</u> Pl.'s 56.1 Stmnt ¶ 12; Def.'s 56.1 Resp. ¶ 12.)  It is also undisputed that (1) First Unum is the only named fiduciary in the Plan; (2) the Plan was not amended to add Unum Group as a named fiduciary; and (3) the Plan contains no procedure for First Unum to delegate its discretionary authority.  (<u>See</u> Pl.'s 56.1 Stmnt ¶¶ 8-11; Def.'s 56.1 Resp. ¶ 8-11; Def.'s 56.1 Stmnt ¶ 2; Pl.'s 56.1 Resp. ¶ 2; R.146-82.)  Therefore, because the Plan contains no express delegation procedure, First Unum could not and did not properly delegate its discretionary authority to Unum Group.  <u>See</u> <u>Rodriguez-Abreu</u>, 986 F.2d at 584; <u>Madden</u>, 914 F.2d at 1283-84; <u>Rubio</u>, 254 F. Supp. 2d at 422.

Accordingly, the Unum Group employees acted as unauthorized third parties – and not as fiduciaries – when they determined that the MIL applied to McDonnell's disability claim and denied McDonnell's request for long-term benefits.  <u>See</u> <u>Sharkey</u>, 70 F.3d at 229.  Given that unauthorized parties made the benefits determination, First Unum's denial of plan benefits to McDonnell is reviewed under the de novo standard.  <u>See id.</u> (citing <u>Rodriguez-Abreu</u>, 986 F.2d at 584).

## III.    Scope of De Novo Review

When applying the de novo standard of review, the Court reviews "all aspects of the denial of an ERISA claim, including fact issues."  <u>Kinstler</u>, 181 F.3d at 245.  Here, McDonnell argues that First Unum's determination ruling out Lyme Disease, CFS, and Babesiosis as physical causes of her disabilities was unreasonable because First Unum applied inappropriate

medical diagnostic criteria.[27]  (See Pl.'s Mem. at 1-2, 7, 9-15.)  In addition, McDonnell contends

that First Unum failed to provide a full and fair review of the medical record, (see id. at 15-19),

and argues that the Court should "apply appropriate skepticism" to the reasonableness of First

Unum's benefits determination because First Unum operated under a conflict of interest as both

claim reviewer and claim payor, (see id. at 19-25.)

　　　　In conducting a de novo review, the Court gives no deference to the insurer's

interpretation of the plan documents, its analysis of the medical record, or its conclusion

regarding the merits of the plaintiff's benefits claim.  See Firestone, 489 U.S. at 112-13, 115.

Instead, the Court "stands in the shoes of the original decisionmaker," Dimaria v. First Unum

Life Ins. Co., No. 01 CV 11413, 2005 WL 743324, at *4 (S.D.N.Y. Mar. 31, 2005), interprets the

terms of the benefits plan, determines the proper diagnostic criteria, see Rodriguez v. McGraw

Hill, 297 F. Supp. 2d 676, 678-79 (S.D.N.Y. 2004), reviews the medical evidence, and reaches

its own conclusion about whether the plaintiff has shown, by a preponderance of the evidence,

that she is entitled to benefits under the plan, see, e.g., Hine v. Hewlett-Packard Co., No. 04 CV

476, 2006 WL 2739697, at *3-4 (Sept. 25, 2006); Dimaria, 2005 WL 743324, at *4; Rodriguez,

297 F. Supp. 2d at 679.

　　　　Generally, a court conducting a de novo review "is limited to the record in front of the

claims administrator."  DeFelice v. Am. Int'l Life Assurance Co. of New York, 112 F.3d 61, 67

(2d Cir. 1997).  The Court may, however, review additional evidence outside of the

administrative record if it finds "good cause" to do so.  Id.  "Good cause" exists when a) a plan

---

[27] Specifically, McDonnell contends that First Unum unreasonably rejected her claim that she suffered from Lyme Disease by applying the CDC's reporting criteria rather than the CDC's less stringent clinical diagnostic criteria. (See Pl.'s Mem. at 9-13.)  Similarly, she argues that First Unum rejected the possibility that she suffered from Chronic Fatigue Syndrome due to her performance on a stress test, which she contends is not used by the CDC as a criteria for diagnosing or ruling out Chronic Fatigue Syndrome.  (See id. at 13-14.)  Finally, McDonnell asserts that First Unum unreasonably ruled out Babesiosis by disregarding her positive FISH assay test, which she contends is 100% accurate.  (See id. at 15.)

administrator has a conflict of interest and b) there were procedural problems with the administrator's review or appeals process.  Locher v. Unum Life Ins. Co. of Am., 389 F.3d 288, 294-96 (2d Cir. 2004).  A conflict of interest exists for ERISA purposes where the plan administrator both evaluates and pays benefits claims.  See Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 112 (2008).  Examples of procedural deficiencies include the administrator's lack of "established criteria for determining an appeal," Locher, 389 F.3d at 293, and the "failure to maintain written procedures," id. at 296.  See also Juliano v. Health Maintenance Org. of New Jersey, Inc., 221 F.3d 279, 289 (2d Cir. 2000).[28]

As for the first prong of the "good cause" analysis, it is undisputed that First Unum was responsible for both evaluating and paying McDonnell's benefits claim.  Consequently, First Unum operated under a conflict of interest.  See Glenn, 554 U.S. at 112.  Turning to the second prong, McDonnell argues that First Unum's claims review process contained several procedural deficiencies; specifically, McDonnell contends that First Unum improperly applied the CDC's reporting criteria for Lyme Disease rather than the CDC's less stringent diagnostic criteria, relied on in-house rather than independent medical professionals, and failed to provide its reviewing doctors with McDonnell's complete records and transcripts of records that certain of its doctors found illegible and thus did not review the full record.  (See Pl.'s Mem. at 19-25; Pl.'s Reply at 10-11); see also DeFelice, 112 F.3d at 67.

In response, First Unum contends that its actions – specifically, allowing McDonnell to file a claim even though it was late, paying McDonnell two years of benefits totaling $450,000, spending time gathering medical evidence, contacting more than one hundred treating providers

---

[28] In Lijoi v. Continental Cas. Co., 414 F. Supp. 2d 228 (E.D.N.Y. 2006), the court found the insurer's written procedures inadequate where it failed to establish, among other things,  how the company assessed conflicting medical testimony and why it considered one doctor's evaluation more credible than others.  Id. at 241.

named by McDonnell, and having McDonnell's file reviewed by six different doctors –

demonstrate that it took sufficient steps to reduce bias and promote accuracy in its claim

determination.  (See Def.'s Mem. at 22 (citing Bendik v. Hartford Life Ins. Co., No. 03 CV 8138,

2010 WL 2730465, at *5 (S.D.N.Y. July 12, 2010)).  First Unum's arguments are largely

inapplicable, however, because they focus on how the Court should weigh First Unum's possible

conflict of interest in the context of a deferential arbitrary and capricious review, (see Def.'s

Mem. at 22-24), not the de novo review appropriate here, (see discussion supra at 13-21).

First Unum operated under a conflict of interest, see Glenn, 554 U.S. at 112, and

McDonnell has sufficiently identified procedural problems with First Unum's claim review and

appeal process.  Accordingly, good cause exists for the Court to review evidence outside of the

administrative record in conducting its de novo review of McDonnell's claim for LTD benefits.

See Locher, 389 F.3d at 294-96.

## IV.    **Summary Judgment Standard**

Summary judgment is only appropriate "if the moving party shows that there are no

genuine issues of material fact and that the moving party is entitled to judgment as a matter of

law."  Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 300 (2d Cir. 2003).  In determining

a motion for summary judgment, "the court must construe the facts in the light most favorable to

the non-moving party."  Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir. 1985).  On cross-motions for

summary judgment, each moving party "has the burden of presenting evidence to support its

motion that would allow the district court, if appropriate, to direct a verdict in its favor."

Barhold v. Rodriguez, 863 F.2d 233, 236 (2d Cir. 1988).

The Second Circuit has held that summary judgment is inappropriate in ERISA benefits

disputes involving dueling medical experts where the resolution of the case depends on the Court

24

adopting one expert's opinion over another's.  See Napoli v. First Unum Life Ins. Co., 78 Fed.

App'x. 787 (2d Cir. 2003); see also Baumer v. Ingram Long Term Disability Plan, 803 F. Supp.

2d 263, 268 (W.D.N.Y. 2011); Troy v. Unum Life Ins. Co. of Am., No. 03 CV 9975, 2006 WL

846355, at *11 (S.D.N.Y. March 31, 2006).[29]  Differing opinions amongst doctors constitute "a

genuine issue of material fact."  Id.  In order for a district court to adopt one doctor's opinion

over another's, the court must assess each expert's credibility.  See id.  Such a credibility

determination "is appropriate at trial, but it exceeds the scope of a judge's authority in

considering a summary judgment motion."  Id.  Summary judgment may only be rendered in

such cases where the opinions of one party's experts are unreliable as a matter of law.  See id.

## V.   **Burden of Proof**

Here, the parties agree that McDonnell submitted "proof that [she] is disabled due to

sickness or injury," (R.166), and that McDonnell qualifies as disabled under the Plan, (see Pl.'s

56.1 Stmnt ¶ 199; Def.'s 56.1 Resp. ¶ 199; R.166, 1482.)  The parties also agree (1) on the

contents of the materials McDonnell submitted in support of her claim, (see R.1-1846), (2) that

First Unum applied the MIL to McDonnell's claim,[30] (see Pl.'s 56.1 Stmnt ¶¶ 199, 281; Def.'s

56.1 Resp. ¶¶ 199, 281; Def.'s 56.1 Stmnt ¶¶ 66-67; Pl.'s 56.1 Resp. ¶¶ 66-67; R.1482-89, 1785-

92), and (3) that First Unum paid only 24 months' worth of disability benefits to McDonnell,

(see Pl.'s 56.1 Stmnt ¶ 199; Def.'s 56.1 Resp. ¶ 199; Def.'s 56.1 Stmnt ¶¶ 66-67; Pl.'s 56.1 Resp.

---

[29] In Napoli, First Unum determined that the plaintiff, a former bond trader, was disabled under the terms of the long-term disability policy that First Unum issued to plaintiff's employer.  78 Fed. App'x at 788.  The administrative record included a supporting opinion from the plaintiff's treating physician, Dr. Freilich.  Id.  Seven months later, however, First Unum, relying on the opinion of Dr. Nesto, one of its in-house doctors, determined that the plaintiff was not disabled under the terms of the policy and terminated plaintiff's benefits.  Id.  Plaintiff unsuccessfully appealed his benefits termination and then filed an action under ERISA seeking to compel the plan administrator to continue paying his benefits.  Id. at 787.  The district court granted summary judgment in favor of First Unum.  Id. at 788.  The Second Circuit, however, vacated and remanded the judgment of the district court, holding that "summary judgment is an inappropriate resolution of this case."  Id. at 790.

[30] As discussed supra, technically Defendant engaged in an unauthorized delegation of its discretionary authority did not apply the MIL itself, but rather allowed Unum Group employees to make the benefits determination.

¶¶ 66-67; R.1483.)  The only issue in this case is whether or not First Unum properly applied the MIL to McDonnell's claim.  (See Pl.'s Mem. at 9; Def.'s Mem. at 1.)

The parties dispute who holds the burden of proof on this issue in the context of a de novo review.  McDonnell argues that she holds the burden of proving by a preponderance of the evidence that she is totally disabled as a result of a physical illness, (see Pl.'s Mem. at 7 (citing Paese v. Hartford Life and Accident Ins. Co., 449 F.3d 439 441 (2d Cir. 2006)), but that "[i]t doesn't specifically matter which [physical illness] she has . . . as long as we know that it is a physical illness," (Tr. at 21.)  Moreover, McDonnell contends that before attributing her symptoms to a somatoform disorder, First Unum had the burden of first ruling out any physical illness as the cause.  (Tr. at 22-23.)  In contrast, First Unum argues that "the Policy placed on [McDonnell] the burden of proving the cause of her disability,[31] and the law places on her the burden of establishing that she qualified for benefits under the Policy."  (First Unum's Reply Br. in Further Supp. of its Summ. J. Mot. ("Def.'s Reply") at 4; see also Tr. at 32-33 (citing R.178).)  Accordingly, First Unum contends that McDonnell bears the burden of identifying and proving the specific physical illness that caused her disability; it is not enough for her to show merely that the cause of her disability was physical and not psychological.  (See Tr. at 30-32.)  As a matter of general insurance law, the insured holds the burden of proving that a benefit is covered by the plan while the insurer has the burden of proving that an exclusion in the plan applies to the claim at issue.  See Critchlow v. First UNUM Life Ins. Co. of Am., 378 F.3d 246, 256 (2d Cir. 2004) (citing Mario v. P & C Food Markets, Inc., 313 F.3d 758, 765 (2d Cir. 2002)) (emphasis added).

---

[31] The parties agree that the term "cause of disability" is not defined in the Plan.  (See Tr. at 33, 54; R.178.)

Although the Second Circuit has not directly ruled on whether a MIL should be construed as a benefit or an exclusion, the Second Circuit has stated that limitations on the amounts of benefits "define the scope of coverage and are not policy exclusions." Zurich Am. Ins. Co. v. ABM Indus., Inc., 397 F.3d 158 (2d Cir. 2005) (holding in a property damage case that the claimant held the burden of proof to demonstrate that the insurance policy's "per-occurrence" limitation did not apply).

District courts within the Second Circuit have directly addressed the question and held that "it is the claimant's burden to prove that his disability is not mental where the plan, as here, limits coverage for mental disability." Katsanis v. Blue Cross and Blue Shield Ass'n, 803 F. Supp. 2d 256, 262 (W.D.N.Y. 2011) (citing Seaman v. Memorial Sloan Kettering Cancer Center, No. 08 CV 3618, 2010 WL 785298, at *10-11 (S.D.N.Y. Mar. 9, 2010); but see Gunn v. Reliance Standard Life Ins. Co., 399 Fed. Appx. 147, 151 (9th Cir. 2010) (holding that a MIL is an exclusion). The Seaman court explained that it was reasonable to place the burden of proof regarding the mental illness provision on the claimant because she "has easier access to her own medical records." Seaman, 2010 WL 785298 at *11.

Here, as in Seaman, "the policy's mental illness provision does not 'exclude[] a particular condition or occurrence from the coverage provided by the policy'" and McDonnell's "disability is not a condition excluded from coverage, as evidenced by the fact that First Unum did pay 24 months of benefits and readily acknowledges that those payments were proper." Id. at *10. Accordingly, McDonnell bears the burden of proving that she is entitled to benefits beyond the 24 months for which she has been compensated already.

Nevertheless, the Plan's MIL states only that "[d]isabilities, due to a sickness or injury, which are primarily due to a mental illness, have a limited pay period up to 24 months." (R.171.)

The Plan does not contain any language stating that the claimant must demonstrate that her disability is due to a specific physical cause in order to prove that the MIL should not be applied.[32]  Moreover, under the rule of <u>contra proferentum</u>, which is applicable here, any "ambiguities in the language of [the Plan] . . . are to be construed against the insurer." <u>Critchlow</u>, 378 F.3d at 256; <u>Pagan v. NYNEX Pension Plan</u>, 52 F.3d 438, 443 (2d Cir. 1995). Accordingly, McDonnell must only prove by a preponderance of the evidence that her disabilities, which First Unum concedes exist, (<u>see</u> Pl.'s 56.1 Stmnt ¶ 199; Def.'s 56.1 Resp. ¶ 199; R.166, 1482), are primarily due to one or more physical causes and not "primarily due to a mental illness."  (<u>See</u> R.171.)

**VI.**     <u>**Discussion**</u>

McDonnell argues that her treating doctors and medical professionals have diagnosed or accepted that her physical disability is caused by Lyme Disease, Babesiosis, CFS, or a combination of these illnesses.  (<u>See</u> Pl.'s Mem. at 9-15.)  McDonnell thus contends that she has satisfied her burden to demonstrate that her disability is primarily due to a physical cause.  (<u>Id.</u>) Although they do not dispute that McDonnell is disabled, First Unum's reviewing doctors rejected each of these diagnoses – and all other possible physical causes – and instead concluded that McDonnell's physical symptoms are primarily due to mental illness, specifically Somatization or Conversion Disorder.  (<u>See</u> Def.'s Mem. at 18-21.)  Consequently, First Unum argues that its decision to apply the MIL to McDonnell's benefits claim was appropriate.  (<u>See</u> <u>id.</u>)  McDonnell, however, argues that First Unum's reviewing doctors applied inappropriate criteria to reject her Lyme Disease, Babesiosis, and CFS diagnoses.  (<u>See</u> Pl.'s Mem. at 9-21.)

---

[32] Although First Unum argues that its discretionary authority provides it with the discretion to interpret what "cause of disability" means in the policy, (see Tr. at 33-34), the Court gives no deference to First Unum's interpretation in the context of a de novo review.

Specifically, she contends that First Unum's reviewing doctors relied on the CDC's surveillance criteria for Lyme Disease rather than its diagnostic criteria; ignored her positive laboratory test for Babesiosis; and utilized a stress test to rule out CFS, despite the fact that stress tests are not part of the CDC's diagnostic criteria for CFS.  (See id.)

In evaluating the parties' cross-motons for summary judgment under a de novo standard of review, the Court examines whether the diagnostic methodologies used by either party's doctors were unreliable as a matter of law or instead sufficiently grounded in established diagnostic criteria so as to create genuine issues of material fact.  See Napoli, 78 Fed. App'x at 790.  The parties agree that the CDC (for physical illnesses) and the Diagnostic and Statistical Manual of Mental Disorders, Volume IV, Text Revision ("DSM-IV-TR") (for mental illnesses) represent the authoritative sources for diagnostic criteria and treatment protocols.  (See Tr. at 29, 40.)

### A.  Lyme Disease

The CDC website explains that Lyme disease is caused by a particular bacterium, Borrelia burgdorferi, and is transmitted to humans through the bites of certain ticks.[33]  See Lyme Disease, CDC, http://www.cdc.gov/lyme/ (last visited July 17, 2013).  Typically, the first indication of infection is the appearance of a circular rash, termed an erythema migrans ("EM rash"), which appears at the bite site and commonly – though not always – is shaped like a bulls-eye.  Id.  In addition to the rash, other symptoms of infection include fatigue, chills, fever, muscle and joint aches, and swollen lymph nodes.  Id.  If left untreated, the infection may spread and cause loss of facial muscle tone (i.e. Bell's Palsy), neck stiffness, severe headaches, heart

---

[33] Pursuant to Rule 201(b) of the Federal Rules of Evidence, the Court takes judicial notice of this background information on Lyme Disease, its diagnosis, and its treatment, all of which is drawn from the official CDC website. See Lyme Disease, CDC, http://www.cdc.gov/lyme/ (last visited July 17, 2013); see also Gent v. CUNA Mut. Ins. Soc'y, 611 F.3d 79, 84 n.5 (1st Cir. 2010); Denius v. Dunlap, 330 F.3d 919, 926 (7th Cir. 2003); Brooklyn Heights Ass'n, Inc. v. Nat'l Park Serv., 777 F. Supp. 2d 424, 432 (E.D.N.Y. 2011).

palpitations, dizziness, swelling in the large joints, shooting pains, and arthritis.  Id.  Months to years after an untreated infection, some patients develop chronic neurological complaints, including problems with concentration and short-term memory.  Id.

### i. Diagnostic Criteria

According to the CDC, Lyme Disease is diagnosed through the presence of the signs and symptoms described above and a patient history of exposure to blacklegged or deer ticks.  Id. at Diagnosis and Testing.  The CDC further states that if a patient shows symptoms typical of Lyme Disease, "[l]aboratory tests are helpful [for diagnosis] if used correctly and performed with validated methods."  Id.  (emphasis added).  Nevertheless, it is important to note that the CDC does not state that positive laboratory tests are necessary to diagnose a patient with Lyme Disease.  Id.

The CDC recommends that laboratory tests of patients' blood for the presence of Lyme Disease bacteria antibodies be administered according to a two-step process.[34]  Id. at Two-step Laboratory Testing Process.  The first test to be administered, the EIA or IFA test, is "designed to be very 'sensitive,' meaning that when [it] is used properly, almost everyone with Lyme disease will test positive."  Id. at Understanding the EIA Test.  Nevertheless, the EIA and IFA tests are so sensitive that it is possible to test positive on them without having Lyme Disease; the positive test could be due to a range of other medical conditions.  See id.  Accordingly, doctors seek to "verify any 'positive' or 'equivocal' (indeterminate) EIA [or IFA] results by performing" a second test – an immunoblot test, such as a Western Blot – which "can help distinguish patients

---

[34] In addition to this laboratory testing regime, the CDC also notes that "[s]ome laboratories offer Lyme Disease testing using assays whose accuracy and clinical usefulness have not been adequately established," and goes on to list tests that were available as of 2011 but which have not been validated.  Id. at Other Types of Laboratory Testing.

who have Lyme disease from those with other conditions." Id.  Laboratory testing "[r]esults are considered positive only if the EIA/IFA and immunoblot tests are both positive." Id.

Like the EIA and IFA tests, immunoblot tests look for the presence of antibodies in the patient's blood. Id. at Understanding the Immunoblot Test.  The immunoblot tests "can detect two different classes of antibodies: IgM and IgG." Id.  The body produces IgM antibodies within the first few weeks of infection; IgG antibodies, however, take 4-6 weeks to appear. Id.

Immunoblot tests do not produce a simple binary result like a home pregnancy test. Instead, in the presence of antibodies, the tests produce "something that looks like a bar code used on grocery items, with several lines or 'bands,'" each of which corresponds "to a different component of the bacteria." Id.  The meaning of each line or band must be interpreted. Id.  For both the IgM and IgG tests, the "presence of any one or two lines is not particularly meaningful." Id.  In fact, the CDC specifically advises that "it is not correct to interpret a test result that has only some bands that are positive as being 'mildly' or 'somewhat' positive for Lyme disease." Id.

In order for the IgM test to be considered positive for Lyme Disease, two out of three specific bands must be present. Id.  (citing to "Notice to Readers Recommendations for Test Performance and Interpretation from the Second National Conference on Seriologic Diagnosis of Lyme Disease," MMWR Weekly, Aug. 11, 1995, Vol. 44(31) at 590-91  available at: http://www.cdc.gov/mmwr/preview/mmwrhtml/00038469.htm (hereinafter "MMWR Notice")). Even a positive IgM test does not necessarily mean that a patient has Lyme Disease.  See id.  The CDC states that "[a] positive IgM immunoblot is only meaningful during the first 4 weeks of illness." Id.  Moreover, tests for IgM antibodies are more likely to produce false positives than tests for IgG antibodies. Id.

In order for the IgG test to be considered positive, "at least 5 IgG bands" should be present.  Id.  (citing to MMWR Notice).  The CDC advises that "[i]f you've been ill for longer than 4-6 weeks and the IgG immunoblot test is negative, it is unlikely that you have Lyme disease, even if the IgM immunoblot test is positive."  Id. (emphasis added).

### ii. Surveillance Criteria

In addition to providing the diagnostic guidance described above, the CDC also engages in the related mission of maintaining the National Notifiable Diseases Surveillance System ("NNDSS"), which tracks the occurence and spread of diseases nationwide.  See National Notifiable Diseases Surveillance System (NDSS), CDC, http://wwwn.cdc.gov/nndss/ (last visited July 26, 2013).  As part of its surveillance mission, for each disease it tracks, the CDC supplies a "Case Definition" that provides physicians with information to be used in classifying and reporting occurrences of the disease.  See id.  These case definitions are found on a separate section of the CDC's website from its disease-specific diagnostic guides.  See id.

The 2008 Case Definition for Lyme Disease provides criteria for sorting patients into "Suspected," "Probable," and "Confirmed" cases.  Id. at Lyme disease (Borrelia burgdorferi).  For example, a patient may be considered "Suspected" of having Lyme Disease with nothing more than an EM rash, even where there is no history of exposure[35] to the disease and no laboratory evidence of infection.  Id.  "Any other case of physician-diagnosed Lyme disease that has laboratory evidence of infection" is considered "Probable."  Id.  A patient is "Confirmed" as infected in three scenarios: when an EM rash is coupled with known exposure; when an EM rash without known exposure is nevertheless supported by laboratory testing; and when a late

---

[35] The 2008 Case Definition defines exposure to Lyme Disease as "having been (less than or equal to 30 days before onset of EM) in wooded, bushy, or grassy areas (i.e. potential tick habitats) in a county in which Lyme disease is endemic.  A history of tick bite is not required."  Id.

manifestation is supported by laboratory testing.  Id.  Nevertheless, the CDC unequivocally states

that "[t]he surveillance case definition was developed for national reporting of Lyme disease; it

is not intended to be used in clinical diagnosis."  Id.

The 2008 Case Definition further defines "laboratory evidence of infection" in a section

entitled "Laboratory Criteria for Diagnosis."  Id.  There the CDC states that for surveillance

purposes, both the IgM and IgG tests should be evaluated using "established criteria" and cites

the same MMWR Notice relied upon by the CDC for its diagnostic criteria.  Id.

In other words, the CDC's diagnostic and surveillance methodologies use the same criteria for

evaluating whether a patient's laboratory testing is positive for Lyme Disease.  Compare

Understanding the Immunoblot Test, CDC,

http://www.cdc.gov/lyme/diagnosistesting/LabTest/TwoStep/WesternBlot/index.html (last

visited July 17, 2013) with Lyme disease (Borrelia burgdorferi), CDC,

http://wwwn.cdc.gov/NNDSS/script/casedef.aspx?CondYrID=751&DatePub=1/1/2008%2012:0

0:00%20AM (last visited July 27, 2013).  The difference between the diagnostic and surveillance

criteria is that the diagnostic criteria deems laboratory testing to be "helpful" for diagnosing

Lyme Disease, whereas the surveillance criteria requires positive laboratory testing to confirm a

case of Lyme Disease if the patient does not have a known history of exposure to the disease or

manifests symptoms late.  See id.

### iii.  Application to McDonnell

McDonnell contends that First Unum's reviewing doctors inappropriately applied the

CDC's surveillance criteria – not the diagnostic criteria – to reach their conclusions that her

medical records did not support a diagnosis of Lyme Disease.  (See Pl's Mem. at 9-15.)  The

administrative record does not support McDonnell's argument, however.  Indeed, First Unum's

doctors appear to have applied the same CDC diagnostic criteria as McDonnell's doctors. However, they evaluated the evidence differently.

By all accounts, McDonnell presented a complicated and confounding medical picture to both her treating doctors and First Unum's reviewing doctors.  (See R.1386.)  She has lived and vacationed in Lyme-endemic areas for approximately twenty years.  (See R.425, 499; Pl.'s 56.1 Stmnt ¶¶ 112-13); see also Lyme Disease Data,  CDC, http://www.cdc.gov/lyme/stats/index.html (last visited July 29, 2013).  She reports that she was bitten by a tick in 1992 and noticing what appeared to be an EM rash.  (See R.424, 453, 499, 1109, 1710; Pl.'s 56.1 Stmnt ¶¶ 39-41.)  She also reports physical and cognitive symptoms that are consistent with Lyme Disease.  (See R.1387); see also Symptoms, CDC, http://www.cdc.gov/lyme/signs_symptoms/index.html (last visited July 30, 2013).  As McDonnell correctly argues, under the CDC's diagnostic criteria, it is possible for a doctor to diagnose a patient with Lyme Disease solely on the basis of a history of exposure and the presence of signs and symptoms of the disease.  See id. at Diagnosis and Testing.  Indeed, Dr. Pollock, McDonnell's attending physician, diagnosed her with Lyme Disease based on this information.  (See R.1109-10; Def.'s 56.1 Stmnt ¶ 16; Pl.'s 56.1 Resp. ¶ 16.)

Nevertheless, this patient history and these symptoms neither necessitate a Lyme Disease diagnosis under the CDC's diagnostic criteria nor generate an assumption of Lyme Disease. Indeed, much of McDonnell's history and testing undermines a Lyme Disease diagnosis, as First Unum's reviewing doctors detailed in their reports.  As Dr. Leverett and Dr. Lambrew noted, McDonnell did not see a doctor at the time she was bitten by a tick in 1992, and thus no verification of the EM rash exists.  (See R.1386, 1772; Def.'s Mem. at 18.)  Moreover, she did

not report being bitten by a tick within thirty days of January 29, 2007, the date when her symptoms became disabling.  (See R.1772; Def.'s Mem. at 18.)

Many of her symptoms – such as headaches, fatigue, stiffness, and pain – are subjective and thus unverifiable by examination.  As for objective observable symptoms, although McDonnell reported experiencing, inter alia, an EM rash, facial palsy, swollen glands, arthritis, joint pain, and swelling, Dr. Lambrew stated in his review of McDonnell's treatment records that "there is no documentation of physical exam findings," "clinical manifestation, or complications" consistent with Lyme disease, (R.1772; see also R.1771), which is consistent with Dr. Leverett's and Dr. Greenhood's assessments, (R.1386, 1479).  Moreover, Dr. Leverett and Dr. Lambrew also noted that McDonnell continued experiencing her disabling symptoms even after receiving a full and "adequate" course of antibiotics targeting the bacteria that causes Lyme Disease.[36]  (R.1386, 1772; see also Def.'s Mem. at 19).  Nevertheless, the CDC acknowledges that 10-20% of patients treated for Lyme Disease with the recommended two-to-four week course of antibiotics continue feeling symptoms afterwards.[37]  Post-Treatment Lyme Disease Syndrome, CDC, http://www.cdc.gov/lyme/postLDS/index.html (last visited July 30, 2013).

In addition to the above aspects of McDonnell's history that suggest that Lyme Disease may not be the cause of her disability, First Unum's reviewing doctors also weighed her laboratory testing, using the CDC's established diagnostic criteria for interpreting the test results.

---

[36] Indeed, as the CDC notes, "[t]he National Institute of Health has funded several studies on the treatment of Lyme disease which show that most patients recover when treated with a few weeks of antibiotics taken by mouth." Treatment, CDC, http://www.cdc.gov/lyme/Treatment/ (last visited July 29, 2013).

[37] The CDC states that the exact cause of Post-Treatment Lyme Disease, sometimes referred to as Chronic Lyme Disease, is not yet known but that "[m]ost medical experts believe that the lingering symptoms are the result of residual damage to the tissues and the immune system that occurred during the infection." Id.

(See R.1386-87, 1478-79, 1770-72.)[38]  Contrary to McDonnell's arguments that she "submitted

substantial positive laboratory findings in further support of a diagnosis of Lyme disease,"[39]

(Pl.'s Mem. at 11), her laboratory test results weigh against such a diagnosis, (see id.; see also

Two-step Laboratory Testing Process, CDC,

http://www.cdc.gov/lyme/diagnosistesting/LabTest/TwoStep/index.html (last visited July 30,

2013).)

McDonnell was tested thirteen times.  The results of these tests are summarized in the

following chart:

| Date | Tier 1: Serology | Tier 2: Western Blot IgM | Tier 2: Western Blot IgG | R. |
|---|---|---|---|---|
| 3/8/07 | Nonreactive | Indeterminate | Negative | 471-73 |
| 4/5/07 | Nonreactive | Indeterminate | Indeterminate | 1116, 1118 |
| 4/26/07 | | Positive | Negative | 461 |
| 4/27/07 | Negative | | | 445 |
| 5/21/07 | Negative | | | 719 |
| 8/7/07 | Negative | Negative | | 1190 |
| 11/30/07 | Nonreactive | Indeterminate/Negative[40] | Indeterminate/Negative | 1117 |
| 12/10/07 | | Positive | Negative | 941-44 |
| 5/14/08 | Nonreactive | Indeterminate/Negative | Indeterminate/Negative | 438 |
| 7/7/08 | Negative | | | 510 |
| 7/21/08 | Negative | Negative | Negative | 435-37 |
| 7/21/08 | | Positive/Negative | Positive/Negative | 426 |
| 7/21/08 | Nonreactive | Indeterminate/Negative | Indeterminate/Negative | 431 |

---

[38] See also discussion supra at 33-34 (noting that both the CDC's diagnostic and surveillance criteria use the same two-tier testing regime and the same thresholds for reading the tests as positive).

[39] McDonnell asserts that she had "5 Western Blot tests revealing positive IgM reactivity under CDC or IGeneX criteria" and "2 Western Blots revealing positive IgG reactivity under the IGeneX criteria."  (Pl.'s Mem. at 11.) IGeneX is a private California-based "reference laboratory," Welcome to IGeneX, Inc., http://www.igenex.com/Website/ (last visited July 29, 2013),  that uses a different methodology than the CDC for evaluating the significance of the bands present on an immunoblot test, (see Pl.'s Mem. at 11).  As discussed supra note 37, the CDC considers the "accuracy and clinical usefulness" of such "[i]n-house criteria for interpretation of immunoblots" to be "unvalidated."  Other Types of Laboratory Testing, CDC, http://www.cdc.gov/lyme/diagnosistesting/LabTest/OtherLab/index.html (last visited July 29, 2013).

[40] Some lab reports used "Indeterminate/Negative" to indicate that the test showed some reactivity but not enough to satisfy the CDC criteria for a positive test.  See Def.'s Resp. at 7-8; see also discussion supra at 32.  Other labs used "Positive/Negative" to indicate this condition.  Id.

(Def.'s Resp. at 7.)  As discussed supra at 31, according to the CDC's protocol, laboratory tests are only positive for Lyme Disease if the patient tests positive on both the Tier 1 EIA or IFA test and the Tier 2 immunoblot test.  Here, as the chart shows, McDonnell never tested positive on the Tier 1 test.  Thus, as Dr. Leverett, Dr. Greenhood, and Dr. Lambrew noted, her laboratory testing is negative for Lyme Disease.  (See R.1386-87, 1478-79, 1770-72.)

Moreover, even though doctors should only administer the Tier 2 immunoblot tests if the patient tests positive on the highly sensitive Tier 1 test, see Two-step Laboratory Testing Process, CDC, http://www.cdc.gov/lyme/diagnosistesting/LabTest/TwoStep/index.html (last visited July 17, 2013), McDonnell underwent Tier 2 testing on ten occasions.  McDonnell had two positive IgM tests under the CDC's criteria.  However, given that the first of these tests occurred more nearly two and a half months after January 29, 2007, the date when McDonnell's symptoms became disabling, and approximately fifteen years after she reports being bitten by a tick in 1992 and beginning to suffer, the IgM test results are meaningless.  See id. at Understanding the Immunoblot Test.  Meanwhile, McDonnell never tested positive for IgG reactivity under the CDC's criteria.  Accordingly, none of McDonnell's thirteen sessions of laboratory testing support a diagnosis of Lyme Disease under the CDC's diagnostic criteria.  (See R.1386-87, 1478-79, 1770-72.)[41]

McDonnell's claim that First Unum's reviewing doctors gave inappropriate weight to her laboratory testing in rejecting a Lyme Disease diagnosis is not supported by the record or the CDC's diagnostic regime.  (See Pl.'s Mem. at 11-12; Pl.'s Reply at 5-7 (citing R.1378-84, 1475-78, 1770-71).)  Although McDonnell argues that First Unum unreasonably insisted on objective

---

[41] Indeed, McDonnell's symptomology and test results appear to mirror the situation directly addressed by the CDC on the Frequently Asked Questions page of its Lyme Disease website, which states that Lyme Disease is "[p]robably not" the cause of such a patient's persistent "joint and muscle pain, fatigue, and difficulty thinking."  Id. at Frequently Asked Questions (FAQ).  The CDC acknowledges that such a patient is ill, but suggests that the cause "is something other than the Lyme disease bacterium."  Id.

proof beyond what the CDC requires, (Pl.'s Reply at 6-7 (citing Hobson v. Met. Life Ins. Co., 574 F.3d 75, 86 (2d Cir. 2009)), the reports of Drs. Leverett, Greenhood, and Lambrew indicate that they did not reject a Lyme Disease diagnosis solely on the basis of her laboratory testing. (See R.1378-84, 1475-78, 1770-71.)  Instead, they assert that they weighed her history, her symptoms, her examinations, and her testing to arrive at their shared conclusion that a Lyme Disease diagnosis was unsupported by the totality of the evidence.  (See R.1386-87, 1478-79, 1770-72.)

Neither McDonnell's nor First Unum's doctors' opinions with regard to a diagnosis of Lyme Disease are unreliable as a matter of law.  See Napoli, 78 Fed. App'x. at 789. Accordingly, issues of material fact remain in dispute regarding whether McDonnell's disability is primarily caused by a mental illness, as the MIL requires.  See id.; (see also R.171.)

## B. Babesiosis

"Babesiosis is caused by microscopic parasites that infect red blood cells."  Babesiosis, CDC, http://www.cdc.gov/parasites/babesiosis/gen_info/index.html (last visited July 30, 2013). The parasites are most commonly transmitted by tick bite, id. at Epidemiology & Risk Factors, and while many infected people are asymptomatic, others suffer symptoms including fevers, chills, sweats, headache, body aches, loss of appetite, nausea, fatigue, and anemia, id. at Disease. Some of these symptoms overlap with common symptoms of Lyme Disease.  Compare id. with Signs and Symptoms, CDC, http://www.cdc.gov/lyme/signs_symptoms/index.html (last visited July 30, 2013).

### i. Diagnostic Criteria

The CDC states that if a patient displays symptoms, Babesiosis "is usually detected by examining blood specimens under a microscope and seeing Babesia parasites inside red blood

cells." Id. at Diagnosis.  Accordingly, if Babesiosis is suspected, "examination of multiple blood

smears should be specifically requested."  Id.  Because it can sometimes be difficult to

distinguish between species of *Babesia* parasites and between *Babesia* parasites and malarial

ones by blood smears, the CDC advises having a reference laboratory confirm the diagnosis "by

blood smear examination and, if indicated, by other means (for example, by serologic and

molecular methods)."  Id.

### ii.  *Application to McDonnell*

McDonnell asserts that she tested positive for Babesiosis on a serologic test called a

"Flourescent In-Situ Hybridization (FISH) assay," which she claims is 100% accurate.  (Pl.'s

Mem. at 15 (citing R.428); see also Decl. of Scott Riemer ("Riemer Decl.") Ex. 7.)  McDonnell

contends that First Unum "simply and incorrectly denie[d] this determinative result," (id. (citing

R.1787)), though she notes that "Drs. Leverett and Greenhood acknowledged the positive test,"

(id. (citing R.1379, 1477).)

First Unum argues that none of McDonnell's treating physicians stated on the Residual

Functional Capacity Questionnaires that they completed for her administrative appeal that she

had Babesiosis.  (Def.'s Resp. at 9 (citing R.1587, 1608, 1617, 1623, 1633).)  One, Dr. Patrick

Fratellone ("Dr. Fratellone"), a cardiologist, listed a primary diagnosis of "Tickborne infections"

but did not specify Babesiosis or explain the basis for his diagnosis.  (Id. (citing 1633, 1639-

1727).)

In addition, First Unum challenges the accuracy of the FISH assay test, arguing that

McDonnell's evidence for her claim that it is 100% accurate comes from the IGeneX website, an

independent reference laboratory that performs the test.  (Id.; see also discussion supra at note

42.)  Moreover, First Unum notes that McDonnell had three FISH assays – on April 26, 2007;

December 10, 2007; and July 21, 2008 – and only the July 21, 2008 test was positive.  (Id. (citing R.426, 461, 941-44).)  Meanwhile, another Babesia laboratory assay test conducted by the same lab on that same day was negative.  (See R.428.)  In fact, other than the FISH assay conducted on July 21, 2008, all of the other laboratory tests for Babesia conducted on McDonnell's blood were negative.  (Def.'s Resp. at 10; see also R.736, 942-43, 1151, 1190, 1386).)

In summarizing McDonnell's test results, Dr. Greenhood stated that "[s]tudies for Babesiosis were negative," (R.1771), and Dr. Leverett concluded that "[t]esting for [non-Lyme] tick-borne diseases was not consistent with acute or chronic infections," (R.1386.)  Similarly, Dr. Greenhood concluded, after rejecting a Lyme disease diagnosis, that "[n]o other cause of a physically based illnesss – including . . . infectious diseases other than Lyme disease . . . – is supported."  (R.1479.)

On the basis of this medical evidence, the Court cannot conclude that McDonnell's or First Unum's doctors' opinions are unreliable as a matter of law.  See Napoli, 78 Fed. App'x at 789.  Accordingly, material issues of fact remain in dispute whether McDonnell's disability is primarily caused by a mental illness.  See id.; (see also R.171.)

### C.  Chronic Fatigue Syndrome (CFS)

The CDC states that CFS is "a devastating and complex disorder" that causes "overwhelming fatigue" along with a wide range of other symptoms "that are not improved by bed rest and that can get worse after physical activity or mental exertion."  Chronic Fatigue Syndrome (CFS), CDC, http://www.cdc.gov/cfs/general/index.html (last visited July 30, 2013).  Researchers do not know what causes CFS.[42]  Id.

### i.  Diagnostic Criteria

---

[42] The CDC suggests that rather than a single cause, CFS may in fact have multiple triggers, including  infections, immune dysfunction, abnormally low blood pressure, nutritional deficiency, and stress that activates the axis where certain glands interact.  Id.

There "is no blood test, brain scan, or other lab test to diagnose CFS."  Id.  A CFS diagnosis "can only be made after ruling out other possible illnesses."  Id.  To this end, when a patient presents with severe fatigue that has lasted six months or longer, doctors should conduct a "thorough physical and mental health exam," and "a series of laboratory screening tests" to rule out other possible causes of the patient's symptoms.  Id.  After having eliminated other possible illnesses, doctors may diagnose a patient with CFS if he or she meets all of the following three criteria:

1. The individual has unexplained, persistent fatigue for 6 months or longer that is not due to ongoing exertion, is not substantially relieved by rest, [and] has begun recently (is not lifelong);
2. The fatigue significantly interferes with daily activities and work;
3. The individual has had 4 or more of the following 8 symptoms:
   a. Post-exertion malaise lasting more than 24 hours
   b. Unrefreshing sleep
   c. Significant impairment of short-term memory or concentration
   d. Muscle pain
   e. Pain in the joints without swelling or redness
   f. A sore throat that is frequent or recurring
   g. Tender lymph nodes in the neck or armpit
   h. Headaches of a new type, pattern, or severity.

Id.  The CDC does not explain, however, how doctors should assess the degree of a patient's fatigue.  Id.

### ii.  Application to McDonnell

McDonnell asserts that between 2007 and 2010, she underwent many examinations for her ongoing fatigue symptoms and that these examinations chronicalled and contained evidence of her extreme chronic fatigue, (R.389, 413, 474, 482, 496, 498-503, 541, 643, 651, 655, 1573, 1581, 1587, 1608, 1610, 1617, 1623, 1631, 1710), impaired memory or concentration, (R.386, 389, 422, 499, 1109, 1559, 1573, 1621, 1623, 1625, 1627), unrefreshing sleep, (R.421, 499, 548), muscle and joint pain, (R.413, 422, 499-500, 502-03, 643, 1109, 1382, 1581, 1588, 1609,

1618, 1634, 1710), headaches, (R.422, 481-82, 499, 502-03, 541, 548, 1382, 1559, 1575, 1634, 1710), and sore throat, (R.422.)

On the basis of this evidence, two of her treating doctors, Dr. Fratellone and Dr. Jerry Gliklich ("Dr. Gliklich"), diagnosed her with CFS.  (R.498, 1633, 1716.)  In addition, Rader Smith's functional capacity evaluation concluded that McDonnell "clearly lacks the physical capacities and endurances to resume any sedentary work, on a full or part time basis, because as observed, after sitting for almost an hour, her functional capacities significantly decreased and she never returned to her initial baseline level."  (R.1583.)

Although Dr. Lambrew notes that McDonnell "meets some of the criteria" for CFS and that her "primary symptom when she went out of work was extreme fatigue," he ruled out CFS as the cause of McDonnell's symptoms on the basis of "her ability to exercise to 10-14 METs" on a treadmill-based stress test.  (R.1772.)  Dr. Lambrew, noting that the cardiologist who ordered the stress test found that McDonnell had "above average exercise capacity," concluded that her ability to exercise at this level did not support her reports of extreme fatigue; inability to function, even while sitting; weakness in her legs; inability to stand and walk due to pain; or sit. (Id.)  Dr. Leverett similarly relied on McDonnell's exercise testing to conclude that her persistent "reports of fatigue . . . are not consistent with [her] demonstrated physical functional capacity." (R.1387.)  Consequently, First Unum rejected CFS as a possible cause of McDonnell's disability.

McDonnell argues that the CDC does not use stress tests to diagnose CFS and that Dr. Leverett's and Dr. Lambrew's reliance on the stress tests was thus unreasonable.  (See Pl.'s Mem. at 14.)  Moreover, she contends that the stress tests do not measure post-exertional fatigue, which she asserts is "the type of fatigue characteristic of CFS."  (Id.)  Given that the patient's experience of fatigue is the defining feature of CFS but that the CDC provides no guidance as to

how doctors should evaluate a patient's fatigue beyond the individual's self-report, McDonnell's argument is unpersuasive.  The Court cannot hold on the basis of this record that either party's doctors' opinions are unreliable as a matter of law.  See Napoli, 78 Fed. App'x at 789. Accordingly, issues of material fact remain in dispute with regard to McDonnell's claim that CFS is the cause of her disability.  See id.; (see also R.171.)

**D.  Somatization Disorder and Conversion Disorder**

Somatization Disorder and Conversion Disorder are both categorized as somatoform disorders – mental illnesses in which patients experience physical symptoms that suggest illness or injury but that cannot be traced to a general physical medical condition, the direct effects of a substance, or another mental illness.  See Am. Psychiatric Ass'n, The Diagnostic and Statistical Manual of Mental Disorders [hereinafter DSM-IV-TR], § 300 (4th ed., Text Revision 2000). Patients suffering from somatoform disorders perceive their symptoms as real and actually feel them; they are not malingering.  Id.  Specifically, Somatization Disorder describes patients who complain of a wide range of general, gastrointestinal, sexual, and pseudoneurological symptoms that recur for years without a medical explanation.  Id. § 300.81.  Patients suffering from Conversion Disorder  experience neurological symptoms including motor symptoms and deficits as well as sensory symptoms and deficits.  Id. § 300.11.

*i.  Diagnostic Criteria*

In order for a clinician to diagnose Somatization Disorder, the patient must present (1) a history of somatic complaints spanning many years and beginning prior to age thirty; (2) at least four different sites of body pain, including at least two gastrointestinal problems, at least one sexual dysfunction, and at least one pseudoneurological symptom; (3) symptoms that cannot be

explained by a general medical condition, substance use, or other mental illness; and (4) no indication that the patient is feigning his or her symptoms.  Id. § 300.81.

A diagnosis of Conversion Disorder requires the clinician to (1) eliminate a neurological disease as the possible cause of the patient's symptoms; (2) exclude the possibility that the patient is feigning his or her symptoms; and (3) determine a psychological cause – such as a stress or conflict – precipitating the condition.  Id. § 300.11.

Finally, if a patient does not satisfy all the diagnositic criteria for one of the specific somatoform disorders – such as Somatization Disorder or Conversion Disorder – a clinician may diagnose a patient with Undifferentiated Somatoform Disorder if the patient displays one unexplainable physical symptom for at least six months.  Id. § 300.81. Nevertheless, it is never proper to diagnose any Somatoform Disorder if an organic/physical cause can explain the patient's symptoms.  Id.

### ii.  Application to McDonnell

McDonnell contends that none of her treating doctors, including Dr. Shea, the psychologist who evaluated her on multiple occasions, ever diagnosed her with a mental illness, (Pl.'s Reply at 3.)  Indeed, although Dr. Shea stated in his initial neuropsychological evaluation that "[w]hile the clinical picture might be seen as one representing a Conversion Disorder or Somatization Disorder," he rejected these diagnoses because he accepted that "her diagnosed Lyme disease represents a true organic disorder" that has caused her symptoms.  (R.396)  In his re-evaluation of McDonnell, Dr. Shea explicitly stated that she "does not fit the criteria for . . . Conversion Disorder (300.11), Somatization Disorder (300.81), and Undifferentiated Somatoform Disorder (300.81).  She does not meet the conditions for a Somatization Disorder as

outlined by the DSM-IV." (R.1566.) Dr. Shea again based his conclusion in part on his understanding that "McDonnell has had Lyme Disease and several common co-infections." (Id.)

 After reviewing McDonnell's medical record, Dr. Leverett and Dr. Greenhood both concluded that the medical evidence did not support any physical explanation for her complaints. (See R.1386, 1479.) Instead, since he rejected a diagnosis of Lyme Disease, Dr. Leverett stated that McDonnell's wide-ranging complaints, "essentially negative exam findings," and medical evaluation reports, including what he termed Dr. Shea's "acknowledgment of [her] 'clinical picture' of Conversion Disorder or Somatoform Disorder," lead him "to medically reasonably infer" that her presentation and complaints were consistent with Somatoform Disorder. (R.1387.)

 Similarly, First Unum's three reviewing psychologists, Dr. Black, Dr. Spica, and Dr. Benincasa, also concluded that McDonnell's neuropsychological and medical evidence did not support a physical cause of her cognitive deficits. (R.1406, 1441-42, 1779-80.) Although he acknowledged that McDonnell suffers cognitive impairments, Dr. Black concluded that there was "clear evidence" that McDonnell's impairments are "due to a primary BH [behavioral health] condition" on the "Somatoform Spectrum." (R.1406.) Dr. Black cited McDonnell's "compelling" MMPI-2 personality test results, which he asserted displayed an "over-endorsement of pseudoneurological symptoms [that] . . . represents a clear somatic preoccupation." (R.1405.) Nevertheless, Dr. Black stated that "[t]here is insufficient historical medical information to establish a definitive specific DSM-IV diagnosis." (Id.) In other words, Dr. Black concluded that McDonnell's symptoms are due to a mental illness, though he wasn't able to specify which one.

Meanwhile, Dr. Spica, who reviewed the raw testing data submitted by Dr. Shea but not Dr. Shea's report, (see R.1441), went a step further and concluded that McDonnell's testing demonstrated that she is not cognitively impaired at all.  (See R.1442.)  Instead, he concluded that "[t]he mild variability in her performance is most reasonably attributed to her detected behavioral health issues."  (Id.)  Like Dr. Black, Dr. Spica – without examining McDonnell himself – concluded that her testing results "revealed significant emotional disruption including somatic focus and probable somatoform defenses."  (Id.)

The third reviewing psychologist, Dr. Benincasa, agreed with Dr. Spica that McDonnell did not suffer from a "substantial cognitive deficit as per [her] complaints" based on her average to superior cognitive test performance.  (R.1780.)  Indeed, Dr. Benincasa stated that McDonnell's "complaints far exceed what would be expected based on the neuropsychological data."  (Id.)  Dr. Benincasa also noted that he found McDonnell's personality testing "to be consistent" and to indicate "a defense coping style using denial and repression as defense which clinically is the underpinnings of conversion and somatoform conditions."  (R.1779.)  Based on these interpretations of her neurospsycholgical testing, Dr. Benincasa concluded that McDonnell's "primary condition is behavioral and psychiatric in the form of Conversion and Somatoform Disorders."  (R.1780.)

As discussed above, a history of multiple physical complaints beginning before age thirty is an essential element of the diagnostic criteria for Somatization Disorder, as is the requirement that a patient display multiple gastrointestinal symptoms and at least one sexual symptom.  See DSM-IV-TR § 300.81.  McDonnell was born on July 5, 1960, making her approximately thirty-two years old when she first reports having been bitten by a tick and experiencing symptoms and forty-six years-old when her disabling symptoms began in 2006/2007.  (See R.1559.)

46

Nevertheless, none of First Unum's reviewing doctors discussed her age relative to the onset of symptoms in their analyses of her medical record, nor did they discuss her gastrointestinal or sexual symptoms.  (See R.1400-07, 1439-43, 1775-80.)  Thus, a diagnosis of Somatization Disorder is unreliable as a matter of law.

Similarly, in order to diagnose Conversion Disorder, the DSM-IV-TR requires clinicians to identify a psychosocial factor – such as a stressor or conflict – that caused or exacerbated the patient's symptoms.  DSM-IV-TR § 300.11.  None of First Unum's reviewing doctors did so. (See R.1400-07, 1439-43, 1775-80.)  Accordingly, a diagnosis of Conversion Disorder is unreliable as a matter of law as well.

Nevertheless, McDonnell has suffered from several physical symptoms for longer than six months.  Given that First Unum's reviewing doctors concluded that McDonnell's medical evidence did not support any physical cause for her symptoms, the Court cannot, on the basis of the record currently before it, hold that a general diagnosis of a behavioral health problem (i.e. Undifferentiated Somatoform Disorder) was unreliable as a matter of law.  Accordingly, issues of material fact remain present with respect to First Unum's contention that McDonnell's disabilities are primarily due to a mental illness.  See Napoli, 78 Fed. App'x at 789.

**VII.    Conclusion**

Given that, for the reasons stated above, material issues of fact remain present in this case, see id., the parties' cross-motions for summary judgment are denied.  The parties are therefore ordered to submit a joint pre-trial order and any motions in limine by **August 19, 2013**. Each party's proposed findings of fact and law are to be submitted by **September 5, 2013**. Bench trial is scheduled to begin on **September 9, 2013.**

IT IS SO ORDERED.

Dated:  New York, New York
       August 2, 2013

Robert P. Patterson, Jr.
U.S.D.J.

**Copies of this Order sent to:**

*Counsel for McDonnell:*

    **Scott Madison Riemer**
    Riemer & Associates, L.L.C.
    60 East 42nd Street
    Suite 1750
    New York, NY 10165
    212-297-0700
    Fax: 212-297-0730
    Email: sriemer@riemerlawfirm.com

*Counsel for First Unum:*

    **Patrick Walter Begos**
    Begos and Horgan & Brown L.L.P. (CT)
    2425 Post Road
    Southport, CT 06890
    203-254-1900
    Fax: 203-222-4833
    Email: pbegos@bbgllp.com

48